Whyte, Judge.
The same question is raised in this case as was in that of Catron’s Lessee v. Charles Lowry and Alexander Lowry, which has been twice argued at Carthage, and is .yet depending on an advisari. My opinion is formed in that case, and is the same that I think ought to be delivered upon the same question.in this. 1 will, therefore, for the purpose of being the more clearly understood, state the facts of that case and my. opinion upon them, for the governance of both, so far as my opinion goes. In Catron’s Lessee v. Lowry, the facts were agreed, and are as follows : —
The parties agree that the following are the facts in this cause : The plaintiff’s title is by virtue of a grant issued by the State of Tennessee to.the lessor of the plaintiff, upon an entry made in the third surveyor’s. district, which grant is dated on the — day of -, 1815, and prior to the session of the General A.ssembly, in said year, upon an entry dated the — day. of.-, 1814. Said grant covers the land in controversy, of which, defendant was in possession at the date of said entry and grant, and of. issuing .the writ in this cause. The defendant derives his .title by virtue of a grant issued by the State of North Carolina, on the 7th day of March, 1796, upon a military, warrant issued by said State. The title under said, grant was regularly conveyed from the grantee to the defendant, before the date of the entry and grant under which plaintiff claims title ; and at and before those several periods the defendant was in possession of said land-under said grant, and the title conveyed to him. Said * grant covers the land in controversy, of which defendant was in possession :as aforesaid. The said land now in controversy is situated about two and a half miles east of a line running south from where the Kentucky line crosses Cumberland River, as said line was run by William Christmas, the late principal surveyor of the first district in this State, in the year 1807, the eastern boundary of the reservation of lands for the officers and soldiers of the Continental line of North Carolina; was never run and marked by the State of North *645 Carolina, and out of the military reservation, as prescribed by the act of North Carolina, nor was the same, ever marked until the same as aforesaid by the State of Tennessee, and recognized as the eastern boundary of the first district. Said land is situated about 40 miles south of the Kentucky line, where the same crosses Cumberland Diver.
It is agreed by the parties, that on the within statement of facts the court may pronounce judgment as upon the finding of the same by a jury; and if it should be the opinion of the court, that from the law arising thereon the plaintiff ought to recover, that judgment be entered for the plaintiff for his costs and term and damages; and if upon said facts the law be for the defendant, that a judgment be entered for the defendant, and that he recover his costs. It is mutually agreed by said plaintiff and defendant, by their counsel, that the cause, John Carson’s Lessee against Charles and Alexander Lowry, be transferred to the Supreme Court of Errors and Appeals for said circuit, to be there finally decided upon the facts agreed by said parties, and entered upon record.
As has been stated from the bar, the question made by this case agreed has come often before the courts of this State, and has received different determinations. In this contrariety of decision, and without reference to the opinions on either side, which are entitled to the greatest respect, I shall consider the * case being unsettled as rea integra, and take it up as it was argued at the bar.
Two general positions have been taken. First, that the defendant’s grant is void; and second, that being void, this can be shown on a trial in ejectment.
To establish the first position, three grounds have been assumed on argument. First, that the State’s officers had no authority to issue a grant for land upon a military claim, by the act of 1783, ch. 3, § 7, lying out of, or beyond the bounds ¡prescribed by the said seventh section of the said act; second, that the act of 1783, ch. 3, § 7, not having given such authority, it cannot be considered as embraced by the act of April, 1784, ch. 14, § 7; and third, as certainly not authorized by act of October, 1784, ch. 19, § 7. It seemed to be admitted, that if authority is not conferred by one or other of these acts, the grant is void, a nullity itself, and pursuant to the opinion of the Supreme Court of the United States in the case of *646 Polk's Lessee v. Wended and others, in 9 Cranch, 99. On the other hand, if either of these grounds failed, the deduction therefrom, to wit, that the grant is void, failed therewith.
It is first to be observed what was the object of North Carolina in these acts of 1783 and 1784. The State of North Carolina, in the war of the Revolution, in conjunction with her sister States of the Union, constituted an efficient party in carrying on that war, and in maintaining the independence which had been declared. In doing this, she had men to raise in making up her quota in the general cause, and also to supply, from time to time, the deficiencies which the casualties of war produced. These troops were to pay, and money, besides, was wanted for many other purposes, as is usual in such cases, much beyond her supplies. At the close of the struggle, therefore, she found herself a debtor State. To discharge this debt was the object of these laws and others not yet mentioned. * Her engagements were of two kinds: for land and for moneys. She contracted with her troops for the first, but not exclusively, and with her general creditor for the second. For the purpose of satisfying these different engagements these acts were passed; or, as she has expressed it, for the redemption of specie, and other certificates, which were documents of her public debt in the hands of her general creditor; and for discharging the arrears due to the army, she passed the act of 1788, ch. 2; and to render an effectual and permanent reward to her Continental officers and soldiers in her service, for their signal bravery and persevering zeal, she passed the acts of May, 1790, of 1782, ch. 3, and of 1783, ch. 3 ; and to further the objects in view by these acts, or some of them, she afterwards passed the acts of 1784, ch. 14, § 7, April session, and 1714, ch. 19, § 7, October session. These acts either appropriate or authorize the appropriation of the greater part of her western lands, by her military claimants and by others who might become claimants by complying with the terms in them prescribed. It would be unnecessary here to quote the passages; they are known to all; they have been the subjects of consideration for years past, and references by year, chapter, and sections, will be sufficient in order to be understood. In the year 1789, North Carolina ceded the tract of country in which the land in controversy lies, together with all that which now composes the State of Tennessee, to the United States, expressly upon condition *647 that all lands laid off or directed to be laid off, by any act or acts of her General Assembly, for her officers and soldiers, shall be insured to their use and benefit, and that of their assigns respectively; and where titles under these acts have not been perfected, the Governor shall, from time to time, perfect them in the same manner as if this act had never been made, and all rights reserved by any act or acts, &c., &c., * shall continue to be in full force in the same manner as if this cession had never been made. 1789, ch. 3, §§ 1, 2. The defendant in the cause is the assignee of a soldier under these acts, whose grant issued to him in the year 1792, from the State of North Carolina, by virtue of the provisions contained in the cession act. The plaintiff is a claimant under the State of Tennessee, by grant issued to him long after the issuing of that to the defendant. Both grants cover the same land, and before any title set up under the younger grant can be acknowledged, the elder grant must be impeached and disposed of. The question, therefore, necessarily turns upon the validity of the elder grant.
It is argued for the plaintiff that it must have been the understanding of the Legislature of North Carolina, in the 1783, and her intention that the satisfaction of her soldiers’ land claims should be made within the bounds prescribed by the seventh section and third chapter of the act of that year, and not otherwise; and in support of this it is said, first, that the intention of the Legislature is to be collected from the legislative act itself, according to certain rules of construction which the common law has adopted and laid down for the interpretation of statutes; that one of these rules is, that an affirmative statute which is introductive of a new law, direct a thing to be done in a certain manner, that thing shall not, even although there are no negative words, be done in any other manner. 6 Ba. Abr. 377. That, therefore, the act of 1783, ch. 3, § 7, assigning the bounds for the satisfaction of the military land claims of the North Carolina line, cannot be satisfied elsewhere, and the defendant’s grant in the present case being one of these claims, and lying out of, or comprising lands not within these bounds, is void.
It is true, that in all cases the substantial parts of a statute must be complied with and pursued, for this is to further the intention of the Legislature, and is * the particular thing to be regarded. It points out the object to be accomplished by the legislative* act. In attaining this object the words are often *648 times disregarded, and even particular provisions are disregarded, as in the instance put in Bacon’s Ab. subjoining the rule quoted upon the statute 43 of Elizabeth, ch. 2, which requires overseers of the poor to be nominated yearly, in Easter week, or within one month after Easter, under the hand and seal of any two or more justices of the peace, in the same county (whereof one to be of the quorum), dwelling in or near the same parish or division where the parish doth lie. Notwithstanding the affirmative and imperative words and provision of the act, which, together with the 39th of Elizabeth is iñtroductive of a new law, and forms, in English expression, the Magna Charta of the poor, the court ordered a mandamus' to issue, to supply, what ? not some formality in the appointment ; not some defalcation extending to a part only of the provision ; but to supply the whole provision of the first section of the statute. Upon what grounds? To carry the intent of the Legislature into' effect, that the object of the statute might be accomplished, not defeated, which was the maintenance of the poor. Although, therefore, the justices, who by the act were authorized and required to do this, had failed to appoint overseers altogether, yet the court, after the lapse of time within which the statute gave the authority for its being done, ordered by mandamus the thing to be done, notwithstanding the objection of a new law and that affirmative ; for, say they, against the justice and meaning of it no negative shall be implied, and it must be liberally construed. See 2 Str. 1124. As opposed to this, the case in 1 Bur. 445, was cited. The question there was, whether the appointment of five overseers was good, when the statute says four, three, or two. It was decided the appointment was not good. This does not impugn the case * in Strange, as I understand it, but supports its principle, to wit: That the power given by the statute of Elizabeth, being for the maintenance of the poor, shall be executed for them in a beneficial manner, and to their advantage. Now the case in Bur. doth not contradict this. The appointment of five overseers was not good. Why ? It was not beneficial to the poor, but the contrary, and therefore did not further the views of the Legislature. And the-reasoning of the judges shows this; for, in rendering their opinions they say, a great number may not do business better than a smaller, and it is attended with a greater expense, and that when business is assigned to a number to be done, it produces the delega *649 tion of tbe actual transactions of it to a few. See Bur. 448, 450. These cases sufficiently prove that the rule relied upon from Bacon’s Abridgement, 377, is not of that absolute, fixed, and uncontrollable kind, that cannot yield, and which cannot be transgressed; but that it is of that arbitrary, technical, and artificial kind which may be exceeded or departed from for good reason ; that it is resorted to as a substitute for expressing the will of the Legislature, when that will is equivocal and not apparent; but when the will of the Legislature is apparent, or may be reasonably collected and inferred, it gives way to the presence of that for which it is a substitute, and is controlled by it, as in the above case. Considering this rule, therefore, as only indicative of the intention of the Legislature, and resorted to for this purpose, and that the intention of these acts is apparent from the acts themselves, and may be well collected from them, it cannot govern the present case. I shall state what I conceive to be the intention of North Carolina in these acts, as far as it bears upon the question, after I have noticed another case or two presented upon this point.
Wilson and Mason, 1 Cranch, 68-102, was cited and much relied upon, for its general reasoning as applicable * to the present, and also to show that particular or limited powers must be strictly pursued, or the consequent acts are void. It is to be observed the cases are not parallel. Wilson and Mason was a controversy between two purchasers of the same kind (money purchasers, I presume), and under the same act, that of Virginia, 1779. The present is between a like purchaser and a military right or claimant under different acts; that, a contest between an entry and a survey upon a caveat, this, between two grants in ejectment. It cannot be seriously contended that all the principles which would govern the question between two individuals on a caveat, would or ought to have the like efficacy upon a grant; that the subordinate matters anterior to the emanation of a grant, should control its operation, and decide its validity after issuance under all the solemnities of law. No point seems to be better settled than this, that many objections which upon a caveat might be urged with success against the issuing of a grant to a party upon a particular claim, ceases to affect that claim after the emanation of the grant: as, in cases of occupancy, who has the occupant right (2 Tenn. Rep. 197, 198); on the locality of a conditional line between two *650 contiguous occupants, or other agreement of the contending parties (October, 1779, ch. 4, § 5) ; so between two entries when the bounds intersect (April, 1779, ch. 6, § 6); also a peaceable possession with an improvement for seven years within the bounds of a former entry, without interruption or declaration of right from or by the person claiming under such former entry, preference shall be given to the settler in peaceable possession. Ibid. § 2. By act of 1778, ch. 3, § 7, surveyor • shall run dividing lines between party and party, according to directions received from them, or agreeable to directions from a jury, without regarding the cardinal points. Also, by act of 1777, ch. 1, § 6, disputes respecting bounds and priority of occupancy * shall be passed upon by a jury, who shall go on the. premises, and, hearing the allegations of the parties, and the testimony of witnesses, are to render a verdict to the court, which being entered with the entry taker, the party shall have an order of survey, &c.
But in all these cases of the patent issuing to the person not entitled, that is, to him who by the result of a caveat would be adjudged not to be entitled, provided the case had been examined, and the parties’ rights controverted, pursuant to the provisions of these different statutes or acts of Assembly (which may happen, either when there has been no caveat, the filing of it having been prevented by fraud; or where there has been one, and the determination upon it anticipated by the fraud of the party surreptitiously obtaining the first grant; or where the determination on the caveat has been influenced by the corrupt practice of the party), can it be said that after the grant has issued the case is open for these objections, and for examination on ejectment; and that the grant may be declared void and deemed a nullity, if it ought not to have issued in the manner it did, it being to the prejudice of the other party who had the better right ? ’ It cannot; an undeniable train of supporting decisions in this State, and in North Carolina, and elsewhere, say the reverse.
The remaining authority on this ground is the case of Polk's Lessee v. Wendal and others, in the Supreme Court of the United States, which lays down this doctrine, to wit: “ There are cases in which a grant is absolutely void ; as where the State has no title to the thing granted, or the officer no authority to issue the grant.” 9 Cranch, 99. This authority states two cases where the grant is *651 absolutely void. The first does not apply, for it is admitted on either side that the State had a title to the thing granted. It is presented on account of the second case, and it is said that the defendant’s claim, being a military one, was * by the act of 1783, ch. 3, § 7, directed to be located within the bounds prescribed by the said seventh section; which, not being done, but located elsewhere, the officer had no authority to issue the grant. I subscribe to the doctrine contained in the above two cases as I understand them. They are corroborated by the decisions of. some of the States which I have seen, and they may be by all for what I know; I have not' seen all. Indeed, they seem to be the essence of these decisions extracted, and concisely expressed. The State may be said to have no title to the thing granted, in the case of land where it lies out of the limits of the State, for there the right of another sovereignty takes place; as a grant for land purporting to lie in some county adjoining the Virginia, Kentucky, or other neighboring State line, and its actual location is beyond that line, and covering land in such neighboring State, there the grant is absolutely void : so where the State has ■ given away a portion of her territory for a particular time or use, as the reservation of the lands comprised within the limits prescribed in the fifth section of the second chapter of the act of 1783, making and stating the said bounds to be a reservation to the Cherokee Indians and their nation forever; there she hath divested herself of the title until acquired by some future act; so also the common case when the State has granted land to an individual. In all these cases the grant may be said to be absolutely void, for want of title to the thing granted. In the first case, the State never had any title, and in the others she had previously parted with her title, and nothing was left for the grant to operate upon. Under the second case, to wit, where the officer had no authority to issue the grant, may be properly comprised those cases where the State still holds the right or title to the land, but has said that she will not part from it, and consequently has forbidden her officers, who are the instruments for passing her title or interest in'her lands, authorized *'and instructed for the purpose, to make a disposition of them. Such are the instances in the act of June, 1781, ch. 7, § 7 ; the words are, “ It shall not be lawful to enter any lands with any entry taker in this State, and in case any shall be entered after the passing, the same are declared null and *652 void. And every entry taker is strictly required to forbear making any further entries on any pretense whatever.” By this law the whole of the functions of the State officers for the passing of her title to lands is suspended, and their authority withdrawn. This act was repealed by 1783, ch. 2, § 2. Suppose after the passage of this and before its repeal an entry had been made, and the land so entered had passed into a grant by the State’s officer, it \VouId have been an instance of a want of authority in the officer of the State to issue, and an example of the second. So in the act of 1783, ch. 2, § 6, is another instance where the officer has no authority to issue without taking into view the fifth Section of the same act. So in like manner is another instance in the twelfth section of the act of 1783, ch. 2, which forbids the entry of the great island in Holston River, and declaring that if any such should be made, it is void; without taking into view the treaty referred to in said section. .Another instance is furnished by the act of November, 1777, ch. 1, § 3. Between all these and the case before the court, it is conceived a great difference exists ; and that they are also very different from cases of irregularities, or imperfect execution of authority in not strictly pursuing it, or omissions, or mere frauds in the officers issuing the grant. In the instances put, the authority of the State’s officers appointed for the purpose, and intrusted with the execution of all the formulae prescribed, for commencing, prosecuting, and perfecting the title in the grantee to lands, and of passing from the State her title to the same, ceases to exist in some form or other, whether by suspension as in some, or by abrogation as in others. The authority * to act in any manner is done away. The State has declared her will, that her interest is not to be transferred, and that if attempted, the acts of her officers therein are void, a mere nullity, having no effect whatever.
I shall now make an application of the doctrine in Polk and Wendal, as I understand.it, to the case under consideration, and in doing this I will admit in effect as the plaintiff’s counsel contend, that the State’s officer had no right in one sense to issue the grant in question to the defendant, that is, that he had no directions to issue a grant on the defendant’s claim, being a military claim, for land in John Armstrong’s bounds. The statement, then, is this: North Carolina authorized her officer to issue grants upon military claims, for the land compi-ised within the military bounds designated *653 in the seventh section of the third chapter of 1783 ; and she authorized her officer to issue grants upon John Armstrong’s claims, for lands within John Armstrong’s bounds. The officer, however, instead of pursuing this authority strictly, issued the defendant’s grant, being a military claim, for lands comprised within John Armstrong’s bounds. Now this was an irregularity in the execution of his authority, or a non-purstiance of its directions; but the lands within both bounds, the military and John Armstrong, were grantable by order of the State. The officer had a right to issue a grant passing the State’s title to both, the one to one claimant, the other to the other. But the officer has granted a part of John Armstrong’s bounds to a different claimant than the law contemplated. The question is, does this make the grant absolutely void? My opinion is that it does not. Were the defendant’s claim to be considered as that of a purchaser simply, and as similar to a claimant in John Armstrong’s office, and without taking into view any other acts than those of 1783,1 would have no hesitation in-saying that-it was voidable by suit for * this irregularity, upon process and proceedings suitable and authorized for this purpose. But. as this claim is, I have my doubts whether it is even voidable, as I shall state presently. I think I am well supported by authority in my opinion, that this grant is not absolutely void. The case of Sears v. Parker, in 1 Haywood, 126, 135, is parallel to the present. The defendant, Parker, was a claimant of confiscated property under the laws of North. Carolina, to wit, land which had belonged to M‘Culloch; but the grant contained other land besides M‘Culloch’s, to wit, vacant land. This vacant land contained in Parker’s grant, Sears afterwards obtained a grant for, and brought his ejectment, and it was decided he could not recover; for, by the court, Judges Ashe and Williams, we have often decided, and are now of opinion, that, the State having granted vacant lands, the first patentee will be entitled to hold them, notwithstanding any attendant circumstances that will render the grant voidable, until it be actually avoided. In this case, the defendant, Parker, is a claimant of confiscated lands.by. purchase of a certain quantity specified, and the State’s officer is directed to issue a grant in satisfaction of the purchase money.
So, in the principal case, the defendant, Lowry, is a claimant of military lands, for services as a soldier, of a certain quantity speci *654 fied, and the State’s officer is directed to issue a grant in satisfaction of these services.
In that case, the land is particularized that is to be passed by the grant to the claimant, to wit, confiscated land, and it is to be within certain bounds designated by the grant to M‘Culloch.
So, in this case, the land is particularized that is to be passed by the grant to the claimant, to wit, military land, and to be within certain bounds designated in the seventh section of ch. 3 of 1783.
Parker’s grant, however, contained other land than *that directed to be granted to him, to wit, vacant land; but it was grantable, also, upon a proper claim by the State’s officer.
So, likewise, Lowry’s grant contained other land than that directed to be granted to him, to wit, vacant land also, likewise grant-able on a proper claim by the State’s officer.
As Lord Ellenborough expresses it, these two causes run on all fours with each other. The principle in both is precisely the same. The State’s officer did not pursue his authority. He. granted the lands to a wrong claimant. He had a right to act, but he acted improperly. Having, however, the authority to act, his act is not void, so says the book, though it may be avoided.
The same is held to be the law in a similar case in the State of New York, from what fell from the Chief Justice Thompson, in the case of Jackson v. Goes, 13 Johnson, 524. He says, if the commissioners of the land office had mistaken their powers, and made a grant to a person not coming within the description in the act, and the patent was sought to be vacated on that ground, there can be no doubt but it must be done by some direct judicial proceeding. Now this is precisely the case in Haywood’s Reports and the present case. In the present case, the commissioners of the land office, that is, the Governor and secretary, issued the grant to the person, says the argument, not coming within the description of the act. The person coming within the description of the act, they say, would be a John Armstrong claimant; but the grant is not made to such a claimant, but to a military claimant that does not meet the description. What is the consequence ? Says the book, if the grant is sought to be vacated on this ground, it must be by some direct judicial proceeding. From this, three things are plainly in-ferrable: First, that in the State of New York, Lowry’s grant would not be considered void ; second, *at most, it *655 would be only voidable ; third, that the matter in avoidance could not be shown on a collateral issue, as not guilty in ejectment.
With these cases of Sears and Parker, Jackson and Goes, exhibiting what is an improper execution of, or non-pursuance of authority, by the State’s officer, in issuing a grant, and the effect thereof, may be noticed and contrasted the cases of the University of North Carolina v. Johnson, 1 Haywood, 373, 375, and the Same v. Sawyer, Taylor’s Rep. 114, as furnishing instances where the officer of the State had no authority to issue the grant, with the effect thereof in illustration of the present point. In the case of the University v. Johnson, the lands had been granted by Lord Granville, in 1763, to Muckleheny, who left the State in a year or two afterwards, and was never more heard of. For want of heirs of Muckleheny, these lands escheated to the State, and by the act of 1789, ch. 21, § 2, w'ere given to the University. The defendant, Johnson, in the year 1780, got a grant for them as vacant land." By the court, Judge Haywood, Williams, Judge, absent, I am of opinion for the University : the grant is absolutely void ah initio, and its invalidity may be shown on a trial in ejectment. It was issued by the officers of the State without any authority for so doing, and is no more binding than if issued by other persons not called Governor or secretary. It is to be observed here that the defendant’s grant issued in the year 1780, and the authority which the officer of the State had to issue grants, at that time, rested upon the act of November, 1777, ch. 1, § 3. That act authorizes the issuing grants for any lands which have not been granted by the crown of Great Britain, or the lords proprietors of North Carolina, in fee, before the 4th July, 1776, or which have accrued or shall accrue to the State by treaty or conquest. Johnson’s claim was. not within the act. His lands had been granted by the lord proprietor before * the 4th of July, 1776 ; and though they had accrued afterwards to the State, it was not by either of the ways mentioned in the act, to wit, by treaty or conquest, but by another way, to wdt, by escheat; they were therefore not grant-able, and the officer had no authority to issue a grant in the case. The case in Taylor’s Reports is to the same effect. These authorities appear to me sufficiently to establish that Lowry’s grant is not void, taking it upon the grant of authority and decision only, in cases similarly circumstanced, and this'without the consideration, as an additional circumstance, of an existing difference of intention in *656 the Legislature between her military and other claimants, as respects the satisfying and perfecting their claims, and of this difference operating in favor of her military claimants. I shall now proceed to examine this intention, and whether this difference exists or not must appear upon the face of the acts themselves, or be collected from them, taken in conjunction with the subject matter of them. By the act of 1782, ch. 3, § 6, North Carolina states the particular quantity of land each of her military claimants are entitled to have from her ; she makes a recognition of a debt or duty in land which she owes them, and that for its satisfaction a tract of country has been reserved by act of Assembly, so long ago as May, 1780, to be appropriated for this purpose. She then goes on the same act of 1782, and directs steps to be taken for laying off the said land, allotted to the officers and soldiers, in one or more tracts, &c., and makes other regulations, progressively tending towards the discharge of this duty. She then afterwards, by the act of 1783, ch. 3, § 7, says “ that the officers and soldiers shall enter and survey the lands within the following lines,” &c., and specifies them. In the next section (8), is a prohibitory clause as to all others, from entering the lands within the said bounds, for three years after passing the act, with an exception * in favor of settlers on the Cumberland River, and of the commissioner, surveyor, guards, and others who laid off the land; their respective quotas are permitted to be satisfied within the same bounds. These are the acts of North Carolina on which the military claim is founded, as far as regards the first ground of argument; and it is material for the expression of them to be noticed, for it differs widely from the expression of those acts on which the other claims are founded, or the acts containing the general land law, as it is called, laying open to the citizens of the State generally the vacant and disposable public, lands thereof for sale. By the act of 1777, ch. 1, after declaring what lands are subject to entry, and the mode of perfecting titles to them, she, in § 9, prohibits any right or title to be acquired in any other manner, and if otherwise obtained shall be void. By the act of 1783, ch. 2, the entry offices which were shut by the act of 1781, ch. 7, are opened again, and the power and privilege of entering extended to all lands within the purview of the act of 1777, ch. 1, and in the same manner as by that act. By this act of 1783, ch. 2, also, the western boundary is extended to the Mississippi, and a portion of the lands contained within this extended *657 boundary is directed to be subject to the entry of £10 claims, but suh modo. It not alone simply says that claimants of land, by the payment of £10 in specie, or certificates for every 100 acres to be entered, shall enter to that amount, but virtually that they shall not enter elsewhere, by being expressly excluded from the balance by the words of the act; it prohibits such claimant from entering within the bounds set apart for the Cherokee Indians, by § 6; it prohibits him from entering within the bounds reserved for the officers and soldiers of the Continental line, by § 12 ; and it prohibits him from entering the great island in Holston River, by the same section. These are the *acts originating the opposing claim, and it is believed that it would be going too far to say that the difference of the language used by the Legislature in these acts was accidental, and not intentional in them, and therefore not entitled to any specific consideration on account of the difference. A good reason for this difference is presumed to exist between the claimant under 1788, ch. 2, and the claimant under 1783, ch. 3. The claimant under the latter act is a military one, unlike the claimant under the former act; he is not a recent one, he is known to former acts ; his claim is recognized as a preexisting one; himself a meritorious claimant, and the act a progressive step towards the completion, on the part of the State, of a previous contract entered into by her with him. As early as May, 1780, by her legislative act at Newbern, she reserved a tract of country to be appropriated in rewarding the signal bravery and persevering zeal of her officers and soldiers in her service. This act I have not been able to see, but from the mention made of it in the act of 1782, ch. 3, § 7, I take the purport of it to amount to an agreement to settle lands on her troops; and notwithstanding that therein no particular lands should be specified, supposing the ease to be so, yet her lafids must be considered as bound by this legislative act or stipulation, and in point of dignity and solemnity at least equal to the articles or covenant of an individual. If an individual covenant to settle lands, and no particular lands are mentioned in'the articles, yet the covenant is a lien upon the lands of the covenantor that he then wrns seised of. 2 Vern. 483. The State was therefore under an obligation for the performance of her contract to her troops, in rendering them their respective quotas of land; and whether satisfaction could be made them within the, limits assigned in ch. 3, § 7 of *658 1783, or not,-impaired not the obligation; the performance could not depend upon these particular limits or be measured * by them, for the lien equitably extended to all her disposable -western lands, as in the case of an individual it would to all the lands he was seised of at the time of the contract (or might even afterwards acquire, according to 2 Vern. 97). And we are not to presume that the State would be deficient in good faith, or would consider an obligation less binding on her than on a citizen, or that a different rule of equity should regulate her conduct, the operation of which would give a latitude in her favor forbidden to the other. These being her obligations, the expression of the seventh section of the third chapter of 1783 may be well accounted for, and considered as 'indicative of her intention in performing her contract, pursuant to the principles of equity. Indeed, this intention sufficiently and expressly appears in all her acts of Assembly on this subject.
How stands the claimant under the act of 1783, ch. 2 ? He had no right or interest previous to that act. And his own proceedings subsequent thereto ? He was not a party to a former contract; he is not considered in the light of a creditor to the State coming forward to have his debt discharged by virtue of a former obligation. He is viewed by the act as a purchaser, and although the price given for the land may be the document of a debt due to him by that State, and operate an extinguishment of that debt, yet it may not be such document; it is still received as a price, excluding the idea of a debt, and he himself is considered as a purchaser, not as a creditor. This document may be so disposed. of or not at the option of the holder. It may be otherwise satisfied by a money payment, the proper fund for its discharge, and made so by the terms of the contract. Act of January, 1781, ch. 3, § 7. This mode of extinguishing her certificate debt by the State of North Carolina is collateral to the contract by which it was created', is accidental as to it, and on her part a cumulative * mode of payment, adopted by her for her own convenience; and without either obligation or compulsion on the side of the creditor, of being acceded to by him. Hence, although the State by this act expected and fully calculated upon a partial extinguishment of. her certificate debt, yet she intended it to be so indirectly, and not eo nomine, and therefore that the claimant should be a purchaser under the act of 1783, ch. 2, and not as a creditor under the act of 1781, ch. 2, § 7.
*659 North Carolina, therefore, bj the act of 1788, ch. 2, is considered as bringing a part of her western lands into market for the purpose of sale. She had, of course, the terms in her power; she had a right to say what lands she would sell, and what she would retain ; what was her price, and what would be received in payment. It cannot, therefore, be expected that her language and her intention to these two different claimants should be the- same ; but different, according to their cases and the nature of them.
The State of North Carolina, then, in 1783, ch. 3, § 7, when she says, “ the officers and soldiers shall enter and survey the lands within the following lines,” hath not said that they shall not enter and survey beyond these lines, nor hath she by restrictive terms confined them within the said limits, as she hath the other claimants within their limits. Mark the expression, the soldiers shall enter the lands. What lands ? The lands within the following limits. Not their claims, or their lands which might be considered as synonymous with claims; but the lands, thereby limiting and confining the land in these lines to the claim, not limiting and confining the claim to the lands. And for this reason, that otherwise her military claimant might have sustained an injury in derogation of her own contract, inasmuch as this claim ought to be. satisfied at all events, whether the particular fund assigned was competent or not to the purpose. Not so *with the other claimant; he came forward at his own seeking, not clothed with a previous duty, to receive satisfaction which might or might not be then made, according to the capacity of the fund; but as a purchaser with his eyes open, of the identical thing, exhibited plainly before him anterior to the first step of appropriation taken by him, and repulsive of the possibility of a mistake.
From this view of the acts of 1780, 1782, and 1783, on this ground of argument, as no negative is expressed, none can be implied against the intention of the Legislature apparent on the face of the acts, taken in conjunction with the subject matter. From this view, likewise, the grant to Lowry is not even voidable, on the ground taken, if a proper proceeding should be commenced for this purpose.
Secondly, it is next in the order of the argument at the bar to be considered, whether, if by the act of 1783, ch. 2, § 7, the defendant’s grant was not authorized to issue for the land covered by it. *660 It was embraced by the act of 1784, ch. 14, § 7, and so authorized. This is taking in the case of removal, and the first question is, had the State’s officer a power or authority in any military case whatever to remove ? A secondary question would be, upon a proper occasion, whether the power ought to have been exercised in this particular instance ? And here, first, it is to be considered, whether this authority is given by the seventh section of the act of April, 1794, ch. 14? The words of the law are general, and to extend to all manner of claims ; there is no restriction confining the remedy given to one class of claimants, in preference to another; and no reason can be perceived why the military claimant alone, as contended by the plaintiff’s counsel, should be excluded from the benefit of an act introduced to give redress for a specified evil, to which he is as incident, and as much exposed, as any other claimant. * What is the evil specified ? The previous legal appropriation of land to the prejudice of any enterer, his entry being thereby rendered ineffectual. Now does not this evil bear as hard on one sort of entereras another, ceteris paribus, upon the military enterer, as the enterer in John Armstrong’s office, or any other enterer? No difference can be perceived in their situation, and no difference ought to be in the redress of their cases, and none under this law can be observed. The argument of the plaintiff turned on the word entry in the section under consideration, It was said, entry was a term used in reference to Armstrong’s claims, locations in reference to military claims. The •terms, therefore, by the words did not include military claims. It may be here observed that this criticism is not strictly correct; for the very law which specifies the military bounds says the officers and soldiers shall enter and survey the lands within, &c. If the criticism were correct it would not govern the case, for the statute being remedial would be extended by equity to the military claimant, being within the same mischief. 5 Com. Dig. 257. So again, says Baron Comyns, in all cases within the same mischief, the case shall be construed within the intent, though it be not within the words of the statute (Ibid. 258); and this intention of the Legislature is to be gathered from reason. Plowd. 205. As before observed, no reason appears why the military claimant should be made an exception of. In previous acts of the Legislature, to say the least of him, he is considered and treated as meritorious a claimant *661 as any. But it is not perceived that the act affords any room for the objection ; the words, “ any .entry,” comprehends every case, and it is a well-known rule in the construction of statutes, that a statute ought upon the whole to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant. 6 Ba. Abr. 380.
* Believing the military claimant’s case within the mischief of this act, what is the remedy given by it ? “ That (in the words of the act) the surveyor shall, and he is hereby authorized to survey the quantity on any vacant land in this State.” This in express terms confers an authority for removal and survey elsewhere, on any vacant lands in the State.
Whether the officer has pursued his authority in this or any other case, in the steps antecedent to removal, and hath done his duty by the act of removal, is what ought not and cannot be made a question of, to affect the validity of a grant from the State on a collateral issue like the present. To constitute a legal discharge of duty, in the officer in this case, there must have been a legal entry by Lowry, or the person under whom he claims. This entry must have been for lands which had been previously granted or entered and located. But if any or all of these particulars has not existed, for example, if there had been no entry of Lowry’s claim, or, if an entry, an illegal one ; or if the lands entered for Lowry had not been previously granted, or entered and located, but remained vacant and subject to appropriation, and, notwithstanding this, the officer had surveyed elsewhere, as he has done: in the officers it would be a breach of duty, it would be a malfeasance in his office; but should it or would it affect the grant ? How could a purchaser under the grant guard against this ? What are Ms means of information ? Has he any adequate means ? He certainly has not, for some of the particulars rest in the knowledge of the officer. Suppose he could inform himself of some of these particulars from the entry offices, yet how inconvenient would it prove in practice ; so much so as to be a complete negative to information. Other particulars of an officer’s duty are not upon record, but are matters in pais, and rest in the breast of the officer himself. Is he to be resorted to for information ? and, if he is, what prospects of succeeding ? * If official duty and public trust are not sufficient guards to correct conduct, can truth and candor from the *662 violator be expected gratuitously to disclose it ? The conclusion is, vain would be the sear eh, fruitless the attempt; and if the object was attained, the public would not find its account in the discovery. To make the highest public document of the landed property of the country depend, upon the strict execution of many particulars antecedent to its issuing for its validity would be unwise and impolitic, and instead of aiding the rightful claimant, would endanger him, by opening the door to excessive litigation. Instead of rendering more secure that property which, in the eye of the law, has ever been held entitled to the highest consideration, it would be shaking the greater part of the titles of the country, by exposing them to the most worthless assailants through the avenues of peijury.
But it is also further said, on argument for the plaintiff, that, on this case agreed, no entry is stated, and we are not to presume one when our decisions say a grant may be good without an entry. Besides, it is said, you cannot presume in favor of illegal acts, but you may do so in favor of legal ones. You must presume this case agreed contains the whole case, and there is no entry; therefore the doctrine of removals falls to the ground. This, in fewer words, is saying there' is no entry ; therefore the grant is illegal; and, as the grant is illegal, no entry can be presumed.
The strength of this objection consists in setting the statement of the case in opposition to the grant, and an inference deduced therefrom, to wit, that there is no entry, against the presumption of law, raised by the evidence of the grant, that there is one. Let us examine this. What is the statement of the case ? It is the allegations or the admissions of the parties placed upon this record and submitted by act of Assembly, for the opinion of the court. And what is a State grant ? * It is a public record (2 Bl. Co. 346; 3 Tucker’s Blackstone, 261, note 10; 10 Johns. 27), a record, too, evidenced in the most solemn manner by the great seal of the State ; for it cannot issue before it is recorded, this act of recording being one of the essentials constituting it a grant, and that before it issues. Act of 1777, ch. 1, § 11; 1783, ch. 2, § 15 ; 1783, ch. 3, § 6. Being a record, what does it import? It importeth in itself absolute verity. If pleaded, it shall not receive trial by witness, jury, or otherwise, but only by itself. Co. Lit. 117 b. Records import in themselves such incontrollable credit and verity as they admit no averment, plea, or proof to the con *663 trary. Co. Lit. 260. And, says Lord Coke, the reason hereof is apparent, for otherwise there never would be any end of controversies, which should be inconvenient. And Mr. Justice Buller, in his Nisi Prius, 221, says they are authentic beyond all manner of contradiction. A State grant or patent is a record of the highest validity and verity, and is conclusive evidence of its contents, to wit, that the State has passed its title to the lands therein contained. It must, at the same time, be conclusive evidence that all the previous requisites existed that were necessary to authorize and render it a complete and lawful act, and which were material and traversable (Phillips, 218, 219; Co. Lit. 352 b); such, for example, as would have been examinable and controvertible upon a caveat, as the objection in the present case, the want of an entry. This being a material and traversable fact, would have been grounds, upon an application to the Governor, for a suspension of the issuance of the grant till after investigation and determination (1783, ch. 2, § 21), as this objection might have been taken and redress thereupon had, if such defect existed. The grant having issued is conclusive evidence at law of the entry’s existence, and also of its validity, to authorize the subsequent measures pursuant to the course prescribed and leading to the consummation of * the title by the execution of the grant. There are many authorities in the books illustrative of this principle and in support of it. Such is the case in 1 East, 355; Phillips, 213. If a verdict, finding several issues, were to be produced in evidence, the opposite party would not be allowed to show that no evidence was offered on one of the issues, and that the finding of the jury was indorsed on the postea by mistake. See, also, 2 Dallas, 125. These authorities prove, first, that the grant is incontrovertible evidence of the entry ; and, secondly, that the inference deduced is inadmissible. But if the statement had, even in express terms, negatived the actual existence of an entry, and the parties had put it down as a fact totidem verlis, “ that there was no entry,” then I would say, that, though the parties, by their admissions, may renounce the benefit of the law, yet they cannot thereby change it, and that the complexion of the case is not in the least varied ; that the evidence of its non-existence, being of an inferior nature io that evidenced by the grant, could not prevail, and, being incompatible with the rules of law, the court' would be bound to disregard it.
*664 It is remarked that our decisions have said a grant is good without an entry. Perhaps it would be more correct to 'say a grant is good without showing the copy of an entry, in the cases where the law requires one, which in the general would be unnecessary, superfluous, and even improper. The existence of an entry by copy would be attested by the officer, he having the legal custody of it. A grant attests the same existence by evidence of a greater dignity, by the great seal of the State, and supersedes all inferior modes of showing the same thing it shows. A grant, being a public record, comprehends within itself every requisite for its existence, and, emanating under the sanction of the great seal, possesses the highest evidence of them, when it is itself used as evidence.' But there are cases- in which the copy of an entry is necessary to be produced, * not for the purpose of barely showing its existence, but to show the modifications under which it does exist, as where, in the development of a title, it is wished to give the grant an operation beyond the date of it. The copy of an entry is requisite for the exposure of particulars not appearing by the grant; not to show that the entry exists, for the grant does that, but to show how it does exist, as to time or date, location, &c., &c.
The third ground is, that the issuance of the defendant’s grant is not authorized by the act of 1784, October session, ch. 19, § 7. . The object of this act is a removal also, but provides for a different case to the act passed the former session of the same year. If its provisions had been the same, it would have been a work of supererogation merely. The purview of both is removal. This of. October, 1784, is cumulative, and extends the benefit of removal to a case not before provided for in express terms; by the former act removal is directed where the lands entered have been previously granted located, or surveyed ; ■ and under it an entry-must have been made of the removed claim, previous to the act of removal, in order to authorize the measure. This act embraces the case where no such entry had been made, and authorizes a removal in the first instance for the want of tillable land. So far, as well on one side as on the other, no difference of opinion exists on this act in the argument. But the question is, was the act in-, tended to be operative, so as to authorize removals from the passing thereof, or from some future time, by the authority of some future act of the Legislature to be passed for this purpose on the same subject. The words of the act are, “ That in case it shall happen *665 that there is not a sufficient quantity of tillable land within the boundaries laid off, for the officers and soldiers of the Continental line of this State, the deficiency shall and is hereby directed to be made up on any unappropriated * lands within the limits of this State.” These words do not seem to me to look to any further legislative act on the subject. What is the evil this statute intended to remedy? The want of a sufficiency of tillable land within the boundaries laid off. What is the remedy given ? The making up the deficiency on any unappropriated land within this State. When is this remedy given ? When the deficiency happens. How is it given ? By this present act; the words are express, the deficiency “ is hereby ” directed to be made up, &c., not by some future act. In discovering whether this was the intention of the Legislature on this point, it will assist our inquiries to take a view of the subject matter of the act, that is the land and the claimants, and see how they stood at the time of .the passing of this act. By the former act of removal, 1784, the Legislature contemplated one of two things, or perhaps both ;• either, first, that the military claimant had by her acts on the subject, originally a right to satisfaction on any of the vacant lands of the State, intended this seventh section of ch. 14 only to be declaratory of that right, and to remove any doubt which might exist on the case raised by the assignment of bounds for their satisfaction by the act of 1783 ; or, secondly, that early perceiving there was an inadequacy in the limits assigned to satisfy her military claim, they must ultimately at some time or other, be satisfied beyond these bounds. She by this act at once said, that where her military claimant’s first effort for satisfaction had been rendered ineffectual by the previous appropriation of another, he might go to whatever place satisfaction could be made him, without the circuitous route of another entry on that place, and there survey, &c.
At this time, also, John Armstrong’s office was shut; all entries were made therein that were intended by the State to be made, and a very considerable portion of the very best of the land subject to entry in that office was appropriated. Again, by the former act of * removal, April, 1784, entries that had been made in the office of John Armstrong, upon lands previously appropriated in that office, might be removed and satisfied on this residtnim ; and by the same act removed county warrants might be then satisfied also.
*666 Such, then, was the state of things at the passing of this act of October, 1784; the fairest portion of the western lands of North Carolina had been entered in John Armstrong’s office, and the office itself shut. Upon the remaining residuum had been turned loose the removed county warrants, removed John Armstrong’s warrants, and removed military warrants in the specified cases for satisfaction, and all this six months before this time. Under this existing state of things, what room is left to induce a belief that the State of North Carolina did not intend the operation of this act to be immediate .for satisfaction in case of want of tillable land ? Why should the military claimant, if there was no tillable land, be driven to the circuitous route of entry in order to attach his claim upon this residuum ? for by this process he could do it under the operation of the act of April, 1784 ; and such must have been the case, if the true construction of this act is, that it was to operate by force of a future act thereafter to be passed, as contended upon argument, and upon future proof of the want of sufficiency of tillable land made to the Legislature ; for he might well conclude, that before these events might take place this residuum would be exhausted, and the redress held out by this act turn out to be only a bubble. Again, to say its operation should not be immediate but consequential upon the events stated, would form an anomaly in these laws, taking them and their purviews together. Upon the very face of them even, the soldier is a favorite claimant, and through the whole series of their provisions he is substantially so in fact. At a very early period, while these lands were almost wholly in a state of nature, covered by their * aboriginal population, and having no legislative provision respecting them excepting only the being forbidden to all others, she pledged them or a part of them to him as a reward for his services. As times advanced and the State in progression made different orders and dispositions respecting them, his interests were always sedulously attended to by her. That she should now by this act lay aside all her former tutelage, and postpone his claim to the simple purchaser in John Armstrong’s office, and in the county offices, would be incongruous and inconsistent indeed; a construction which I cannot possibly think correct.
It is further said in the argument, that this act is future, and that it only amounts to a legislative promise, necessarily presuming not *667 only the existence of actual deficiency of tillable land, but also that this is to be proved by evidence ; then legislative interposition is to be made to render this promise efficient, by the establishment of a district for this purpose, or in some other way. The complexity of this mode, and the difficulty attendant upon its execution, imposes a negative upon it, were there no other objections. If better proof of the deficiency of tillable land is wanted by the State than that of her own accredited officer, who hath been intrusted with the execution of the whole business previous to this time, who hath necessarily traversed in the discharge of his duty the whole surface of the military reservation, who hath made all the locations and surveys then existing therein, it is difficult to perceive what that better proof cpüld be. Taking it in the abstract, one creditable witness is sufficient by our law to prove any fact, unless in a few excepted cases, one of which this is not, neither do their principle apply to it; surely the objection of want of credibility cannot be taken by the State to her own officer, who hath so highly possessed her confidence. This fact of deficiency, then, is as well proved as facts in general are or require * to be, being established by one creditable witness and him necessarily cognizant of the fact. A mode of proof mentioned in argument is, a resurvey of all the lands appropriated, and an examination of the surface of the reservation by one or more persons appointed for the purpose. As has been observed, the difficulty of this enterprise, the time to be consumed in the execution of it, and the expense, would form an extreme case that never would be resorted to, and if it was, would not be more satisfactory than the former; every mode other than by survey and examination would be still less so, such as the testimony of persons from different parts of the limits at the bar of the Legislature.
But while all this should be a transacting, what becomes of the fund? What protects it in the interim ? Nothing. Surrendered by the act'of April, to the,pleasure of the removed warrants, and still liable to be selected from by them, what prospect at a distant period for the military claimant, who has as yet made no progress in getting his land ? Beyond this fund, thus laid open to all, he cannot look; the State had no other in reserve. To establish a hypothesis of this kind, as the erection of a district at a future time, upon future events, to be brought into existence by means we *668 know not, is contrary to the purview of all the antecedent acts on the subject, involving difficulties insurmountable in practice, irreconcilable with the existing state' of things, and certainly as holding out a benefit to the soldier that would prove illusory in the extreme. Such an interpretation of the act cannot for a moment be entertained. When the letter of the law does not in plain terms show its intention, it shall never by construction'impute bad faith to the State, but the spirit of the whole of the acts on the subject shall govern ; that is, to confer upon her military claimant a benefit, not an injury. And, as all the vacant lands in the State * were open to him before, in a certain event, instanter, this act must be intended to be cumulative, dispensing with that condition, and opening to him the same fund iu common with other claimants.
The cession act has been adduced and relied upon to show that a future provision, by erection of a district, was contemplated by the Legislature. But the object of that section or condition of the cession act is evidently the preservation of rights then existing under her laws in as ample a manner as if the cession act had not been made, and the enumeration of her land claimants, and the mention of their particular claims is only in majorem eautelam, and shows her solicitude that no injury should be done by her transfer of sovereignty to the United States. But if the phraseology could be considered as having any effect upon vested rights by previous acts, or intended to have any, it would not support the point contended for, for it says, “ such officer or soldier shall be permitted to take his quota, &c., &c., in any other part of said territory,” excluding the idea of any other agency.
The second general position is, that a void grant may be shown to be so on a trial in ejectment.
This position, to a certain extent, was not controverted on the other side; they admitted that a grant .absolutely void might be impeached oil a trial in ejectment, but they denied that this could be done in the cases where the grant was voidable only ; that in these an investigation of the circumstances and facts in avoidance, could not be made in this action; that Lowry’s grant was not a void grant, that at the most it was only voidable (which they did not admit), and not impeachable by parol evidence. The points in difference were, the fixing the boundaries between void and voida *669 ble, and wbat evidence was properly adducible to show a grant void.
As I have considered the defendant’s grant neither * void nor voidable, from any circumstance that appears upon this case agreed, it is not absolutely necessary, for the decision of this canse, to give any further opinion, in addition to what has been incidentally stated on these points; but, as it may be expected some notice should be taken of a point so much argued, I shall briefly take a review of some the English and American authorities relative thereto, and state what I consider to be the law on the subject, as applicable to a State grant for land in this country.
In England, as well in the cases where the King’s letters patent wei’e void db initio as in the cases where they became void by matter subsequent, the usual practice was to declare them so upon scire facias, the process generally used to repeal them. See 2 Saunders, 72, note 4, and authorities there cited, and 4 Inst. 88. In many other actions, also, the King’s letters patent have been declared void by the court; as, in 12 Co. 86, where the King granted 20 acres out of his manor of D. by letters patent, they wei’e adjudged void for the uncertainty. This was upon petition in the Exchequer. So, in 5 Co. 94, the Queen’s letters patent were declared void, for she was deceived, the valuable and material part of the consideration being false. This was in an information of intrusion. So, in 10 Co. 110, the letters patent were declared void for a false suggestion. This was in ejectment upon special verdict finding the letters patent and other records. So, in 1 Co. 26-31, letters patent were held void for the grant contrary to the rules of law. This was upon information of intrusion. On the other hand, 10 Co. 67, a case of information of intrusion; 2 Co. 54, a case of trespass; 6 Co. 5, 6, case of petition to the King and referred to the chancellor, and others; 2 Co. 17, and Plowd. 454, 5, 6, case of petition in the Exchequer, are instances where the validity of the letters patent was controverted, * and they were adjudged good; but in all these cases it is to be observed, the letters patent were spread on the record, and the validity or invalidity of them appeared upon the face of the letters patent themselves, or upon them and other records taken.together. Mr. Justice Blackstone, in his Commentaries, says, “ When it appears from the face of the grant that the King is mistaken or deceived, either in *670 matter of fact or matter of law, as in case of false suggestion, misinformation, or misrecital of former grants, or if his own title to the thing granted be different from what he supposes, or if the grant be informal, or if he grant an estate contrary to the rules of law, in any of these cases the grant is absolutely void.” 2 Bl. Co. 348. These authorities incontrovertibly prove that, where the King's grant is absolutely void, and the matter rendering it so appears upon the face of the grant singly, or in conjunction with other records, and this matter is spread upon the record in some suit, so as to come judicially before the court to be passed upon, the judges have always declared them void, or otherwise, according to the nature of the case; and this, notwithstanding some authorities say that a void grant is to be declared so upon a scire facias brought for the express purpose. The King’s letters patent have also been declared void upon a bill in equity, as in the case of the Attorney-General v. Vernon, Brown, and Boheme, 1 Vern. 388. In this case it is said that the scire facias is not in all cases a competent remedy to avoid letters patent. It is not so, wherever the matter in avoidance is dehors the grant, and appears not in the body of it; per Montague, Chief Baron, and Jones, Chief Justice. In all such cases, they say, the scire facias will not reach it, and therefore the remedy is by bill in equity; and so decided in this case, and the letters patent decreed to be delivered up and canceled. Ibid. 392.
It is to be observed that many things in England * were the subject matter of grant, and passed by letters patent, which are unknown amongst us, such as the numerous host of franchises, exemptions, impositions, and offices ; the appendages of royalty and prerogative, tolerable perhaps in England, but here unsuitable, and of course non-existing, being perfect sinecures, were the eager objects of acquisition by letters patent, and the fruitful sources of litigation afterwards; with these the books are filled, but furnish not the best examples to draw inferences from, and illustrations of the present case. The things constituting the object of letters patent, most common to both countries, are new inventions, and lands. The public lands in England were vested in the King, in his political capacity, as sovereign, and were for the public benefit transferable by him, the usual evidence of which was his letters patent. Our public lands are also transferable for the public benefit, and usually also by letters patent, under the great seal of *671 the State; but tliere is this difference in the two cases: that in Eng land the particular consideration, the moving cause-, the grounds and reasons influencing the King, and the other motives inducing the transfer, rest with him in the first instance, unlimited and unrestrained by positive law ; they were, therefore, generally in the form of recitals incorporated with the letters patent, and made a constituent part thereof, appearing on their face. With us the case is widely different: our positive written institutions, either in the form of a ^constitution, or statute, or both combined, have prescribed what lands shall be transferred from the public fund, on what occasion, and for what consideration. From this difference of practice, it necessarily results, that many of the questions originating upon letters patent in England, have not occurred, and are not likely to occur here; the particular temptations for fraudulent acquisition, and the facilities for accomplishing it not being afforded. Many of them cannot occur at all, and others, * depending upon the principles of the common law, interwoven with the prerogative, are here anticipated, and settled beforehand by the general statute law of the State. Hence the question of valid or not, upon a State patent for land, has assumed somewhat of a different form here from what it would be in England, on letters patent for the same tiling, and the distinction between void and voidable is more clearly marked in the decisions of our own country thereon.
Having premised these observations, I will now proceed to take a short review of some of the American authorities, which for the above reasons I conceive to be more apposite to the present case than the English. In the State of New York the doctrine seems to prevail, that in ejectment where there are two conflicting patents, the elder must be impeached and set aside, before any title set up under the younger patent can be acknowledged. The distinction between void and voidable is made, that the former must appear on the face of the patent to render it void in a court of law ; that the latter is for matter dehors the grant, as fraud, irregularity, or mistake, which only can be avoided by suit on being directly put in issue by the pleadings ; that chancery is the proper tribunal for this suit, either upon scire facias, or bill, or information. It is further remarked, that it would be against precedent, and of dangerous consequences to titles, to permit letters patent, which are solemn grants *672 of record, to be impeached collaterally by parol proof in this action. Jackson v. Lawton, 10 Johns. 26.
In Virginia it has been decided, that matter dehors the grant might be shown in avoidance at law, and this even by parol proof in an action of ejectment; but Saint George Tucker, in his notes on Blackstone’s Commentaries, contests the propriety of this decision, and contends that in a court of law upon a collateral issue, no evidence ought to be admitted to avoid the patent, which is not at least of equal or superior dignity * to the patent itself, and he puts the case of two patents produced in ejectment by the opposite parties for the same land. If one, he says, appears on the face to be perfect, and the other defective, the perfect one ought to prevail, unless it can be shown that the perfect one hath been repealed by judgment of the High Court of Chancery, for some fraud or false suggestion of the patentee ; if both patents are apparently perfect on the face, the elder ought to prevail by the established rules of law, as, being of equal dignity, they cannot stand together. But if the younger recite that the former hath been forfeited by due course of law, and that for that cause the younger hath issued, here, says he, the evidence arising out of the younger patent would be sufficient to avoid the elder, being of-equal dignity with it, and containing matter sufficient to render tha tvoid which on the face appeared perfect.
In Maryland the practice has been from the earliest times, to examine into the validity of letters patent for the proprietor’s lands in chancery, .either by scire facias, as in 1 Har. & M‘Hen. 165, or by bill in equity, as in page 23 — 26, of same book, or by information in equity, same book, page 92-144 ; in all which cases, the letters patent were recalled, and canceled by the chancellor. Indeed it is held in 2 Har. & M'Hen. 141, by the chancellor, that the elder grant, till repealed in chancery, must prevail at law against a younger grant.
In South Carolina, a court of law will not look beyond the date of the grant, considering all prior objections thereto as disposed of by the court of caveats, and this antecedent matter forever foreclosed by its issuance. 2 Bay. 426, 456.
With these two exceptions, to wit, that where the chancellor of Maryland held the elder grant must prevail until repealed, and the other the case of Wills v. Hambleton, 1791, in the Court *673 of Appeals of Virginia, * where it was held the patent might be made void by parol evidence in ejectment — with these two exceptions, 1 say, which form extreme cases, the decisions of the different States, as far as I have had an opportunity of consulting the books, do not permit a State grant to be avoided in ejectment by parol proof; but if the grant is absolutely void for matter apparent on its face, or for matter that may be collected from the inspection of the grant, and from the records of the country taken together, such l’ecords as in contemplation of law are known to all men, then it may be impeached when exhibited as evidence, either on ejectment, or any other action, and held void. But if the matter in objection to the grant is not of that nature that it may be known to all men, then it is only in avoidance, being dehors the grant, as frauds in the officers and party, irregularities in the previous steps required, non-compliance with particular forms, &c., &c., before issuance ; these and others of a like nature only can be shown upon a suit brought for the purpose of impeaching the grant. What this suit should be, has in this State and the State of North Carolina been spoken doubtfully of, and upon which I shall not at present undertake to express an opinion. In England it is by scire facias, by petition, and, in one instance, by bill in equity. In Maryland, by scire facias, by bill in equity, and by information in equity. In New York, the same practice as in Maryland seems to be recognized as a correct practice.
Confining the question of the State’s grant for lands being absolutely void or a nullity, to be decided by the grant itself and the public law of the land, is a plain, simple, easy test, and of public convenience. In far the greater number of instances it will carry with it the evidence of its own validity; the purchaser under it will see, or at least the law presumes he will, and he may so in fact, unless he is ignorant of the law, whether it be good or not. Unembarrassed with the * examination of the numerous circumstances that possibly might exist, and which only can be brought forward on a direct proceeding to impeach it, he is relieved from the apprehension of them, and also from their investigation on all collateral issues, and in case of a direct proceeding, he has notice of the attack, and the points to be insisted on, and so be prepared in the defense if the case admits it.
That a void grant for land only, and not a voidable one, can be *674 taken advantage of in ejectment, and that its being void must appear so by itself and the public law of the country, is considered to be the doctrine in the case of Polk's Lessee v. Wendal and others. It is understood to be the law of New York, Maryland, North Carolina, and South Carolina, the opinion of Saint George Tucker of Virginia, and, as I think, the law of this State. That the validity of a grant for land should be otherwise tested than by itself and the public law of the country, would be to destroy its security and solemnity, and totally to deprive it of that confidence which, as the highest evidence of the highest property of the country, it ought to possess, and be by all considered and taken to possess, and this for the quiet and repose of the public in general.
Judgment must therefore be entered up for the defendants.
RoaNE, Judge.
From the bill of exceptions in this case, it appears that the plaintiff read in evidence a grant dated 20th July, 1796, founded on a warrant usually termed an Evans’s battalion warrant. The defendant gave in evidence a grant dated in the year 1793, founded on a military warrant; and it was proved that the land covered by it is south of the military line and out of the military reservation. The court instructed the * jury that a grant founded on a military warrant, and out of the military bounds, was void, and conveyed no title ; it also gave other instructions to the jury tending to evince that the plaintiff’s grant did not cover the land in dispute. To the charge of the court on these latter points the plaintiff excepted. A verdict and judgment was given for the defendants, and the cause removed by writ of error. The sole question now presented to the court is, whether the defendant’s grant, being without the military reservation, be void ; for if that grant be good, the court ought not to remand the cause for trial over, though, on examination, it should appear that the charge was incorrect on other points.
The question is the same which was brought before the court at Carthage in the case agreed, Catron's Lessee v. Lowry. The case was several times ably and ingeniously argued on both sides, and has been continued on advisement for several terms.
The opinion which has been at last agreed on in that case will decide the present question.
In discussing this subject, two questions were presented for consideration : 1. Whether a grant founded on a military warrant for *675 lands not within the military reservation be void? 2. If it be void, can it be inquired into in an action of ejectment ?
Since the time when the court determined in the former suit, I have not had time to commit to writing my ideas on that subject; it may .now be sufficient to say that the result of the opinion delivered (by Judge Whyte) is in conformity with mine, that a grant on a military warrant without the military bounds is not void.
On the second point, as I understand that opinion, I cannot entirely concur ; but as the decision of the cause does not rest on this point, it will only be necessary to state briefly the opinion I entertain on that part of the subject. A grant may be repealed by a sci. fa. * founded upon a matter of record, making an issue upon it to be tried by a jury, and upon that a judgment may follow to annul and vacate it.
Further, I am of opinion that consistently with the spirit of our Constitution found on 29 article of Magna C harta, that a grant ought not to be repealed by a bill in equity in which the chancellor is not bound to refer to a jury the matters in issue. In this court no grant is recorded, nor any inquisition of a jury returned, to serve as a foundation for the proceedings against it.
If a grant be void for matter precedent to its completion, and remains unrepealed, the evidence to show that it is void, whether parol or otherwise, may be given on a collateral issue, in any action where the validity of the grant comes in question, in the same way, and to prove the same facts, which it would be received to prove in an issue on the sci. fa. Upon such evidence the jury, under the direction of the court, will apply the law and consider the grant void; otherwise, he against whom a void grant should be produced would be obliged to give up his possession to the grantee of such void grant, though he. should be in possession of indubitable testimony fully competent to its destruction on a sci. fa. There is no reason for rejecting the evidence in one case more than the other, and to say that a grant, however fraudulently obtained, cannot be set aside unless for a defect appearing on the face or on some matter of record (which a fraudulent procurer in almost every instance will take care shall not appear), he will have nothing more to do but to act as fraudulently as suits his purposes, and then intrench himself behind the rule that his fraud must appear of record or can do him no harm. After a repeal of a grant it can never again have any effect, nor can the *676 grantee claim any interest under it. It is deemed as absolutely void as if it had never existed. But an avoidance on a collateral * issue does not effect a repeal, for until repealed it may from time to time be brought forward again, and be met with the same evidence as at first.
On the other point in which objections were made to the charge of the judge, respecting the grant ot the plaintiff below not covering the land in dispute, whether the fact be so or not, I have not made much inquiry, but think the judge expressed his opinion of that part in language too strong and conclusive. He ought rather to have left it to the jury to ascertain the fact from the testimony; and I should be disposed to reverse the judgment on that ground, and remand the cause for another trial. But, as was said before, the court ought not to remand a cause for trial when the opinion on the other ground is decisive as to the rights of the contending parties.
Haywood, Judge.
A grant void in law may be set aside at the instance of a prior grantee by sci. fa. in the name of the government; and when void ah initio, the court and jury on a trial in ejectment, or other action, where the question becomes material, may consider it so, and the party opposed to it may plead non concessit. A second patentee cannot have the sci.fa. because not prejudiced by the first grant when it issued, and because the right to a real action cannot be transferred by the government without a special recital, which is not contained in the second grant. But a sci. fa. may issue, though the grant be void, to prevent the multiplicity of actions which its continuing unrepealed might produce. Dy. 197, 198; 5 Com. Dig. “ Patent,” F 4, F 5; 10 Rep. 169; 11 East, 106; 5 Com. Dig. “Patent,” F 1; 17 Vin. 78, pl. 6; Plow. Com. 492; 2 Vest. 944; 17 Viner, 113, 114.
In other cases where a grant becomes void by matter of pais ex post facto, it cannot be avoided but by * sci. fa., and the sci. fa., being a writ founded upon matter of record, must issue either upon the record of the patent in the Petty Bag, or upon an inquisition returned into a court of record or conviction upon an indictment in a court of record. 5 C. Digest, “Patent,” F 7, F 8; 1 Ny. F. 420, 426. In this country it can only issue upon an inquisition or verdict, for there is no court in which the patent is recorded. 17 Vin. 115, pl. 3. None but the first grant can be impeached by it, at the instance of the public, or one having a *677 right infringed by it when it issued. That, perhaps, is the reason why courts of equity in America do not consider the grants void which are obtained in prejudice of an equitable right, but order the grantee to convey to him, which would not benefit the plaintiff if the grant were void. The Circuit Court having by various acts the same power as the Court of King’s Bench exercised, may give judgment of conciliation. 2 Saund. 23. But the sci.fa. in which it is given must be founded upon a previous inquisition returned into court, or upon a conviction as before stated.
In the case of grants absolutely void, in some cases a sei. fa. is useless; as, if the lands be not grantable by law, that cannot be made more apparent by any verdict or other proceeding upon the sei. fa., or where lands are granted by a supposed power not embracing them; if the grant upon the face of it is to be void upon condition, the performance of which is to appear of record by a certain day, on which day it does not appear of record, and the breach is as evident already as it could be made by a verdict on record. But the case is otherwise where the fact does not appear of record. It is apprehended that a repeal cannot be effected by a bill in equity; because that originally being no court of record, its sentence or decree could not nullify a record. For unwm quidque dissolvitur eo ligamine quo ligatur; * and since these courts were made courts of record, this new jurisdiction hath not been added to them. And how can they exercise jurisdiction, when the courts of law are competent, proceeding by common law forms, and by the verdict of a jury ? Moreover, where is the record that can give the Court of Equity a power to act upon it ? No office or inquisition is returned into equity, nor any convictions made there upon the trial of informations or indictments. These are provided as safeguards to the people ; their rights cannot be approached but through the fiat of a jury; and shall a court of equity proceed without them, when a sei. fa. could by no means be resorted to ? A court of law can give judgment of consultation ; it can cause offices to be found, and traverses to be made and tried ; and the Attorney-General will assist when instructed by the government, or some person is injured and are liable to be relieved against a grant that first issued.
Notwithstanding, however, a grant may not be repealed if void, its invalidity may be noticed, when it comes into question, col *678 laterally in an action. Then the court incidentally determines the question, and gives judgment for or against the grantee, leaving the grant unrepealed, and in a condition to be brought forward at another time, when the claimants under it may think proper. There is no inconvenience in this when the cause of invalidity appears on the face of the grant; as, if it be a second grant, for land already granted to another, and that it appear on the face; or if it be for Indian lands, and that appear on the face of the grant; and even if the fact did not appear on the face of the grant, but was found by verdict; or if a grant be founded upon a warrant of commissioners who have no power in that particular case to direct the grant to issue, and it appearing on the face to have issued on such unauthorized warrant. 17 Viner, 114, 115, pl. 2. Should North Carolina open an office * and sell lands in Tennessee, and issue grants upon pretense of a power reserved to her by the cession act, or upon a forged warrant, or for the satisfaction of a claim not comprehended in the cession act; or if one should die without heirs in Tennessee, leaving lands undevised, could these be entered in our present offices and granted ? Certainly not. The authority of these officers -only extends to vacant lands never before appropriated; and as soon as the fact is sufficiently verified that these were escheated lands, the law would pronounce it void, and the court would be bound so to consider it. So, likewise, of the lands confiscated, which should be entered and granted as vacant lands. The entry taker having no power to receive an entry for such lands, nor to issue a warrant for the surveying of them, a grant of such lands, founded upon such entry and survey, would be considered as of no effect, and would be wholly disregarded when a jury were satisfied of the fact of there being confiscated lands. Though, if the grant remain unrepealed, and at some future day the fact of confiscation should become incapable of proof, the grant would then take effect. If the alleged cause of invalidity were the breach of a condition subsequently to be performed, or some act done ex post facto, such grant could not be avoided by a sci. fa. founded upon an inquisition ; for the estate once vested by it could not be divested by a solemn act, equal in dignity to the grant itself. Suppose military lands entered in John Armstrong’s office, and paid for in money, and a survey and grant of them, all which appeared on the face' of the grant; the court would say without *679 further inquiry, it is void. If the fact did not appear in the grant, but on a special verdict between A and B, the court would, as between these parties, avoid the effect of the grant in that controversy, though not the grant itself. The court wpuld in that contest give judgment against him who claimed * under the grant. If the same fact appeared upon inquisition and traverse, and a sei.fa. founded upon it, then the court could in their judgment order the grant itself to be canceled. A court of equity could not say the grantee should be a trustee for a subsequent military grantee, for what legal estate would be in him to support the trust ? If by law a military claim could not be satisfied by lands enterable in J. Armstrong’s office, and the grant should show" upon the face of it that a grant ‘for military services had issued for lands in John Armstrong’s district, it would be considered as a void grant. But if in any case such grant could be legal, then it would not be considered as void, until further and more distinguishing proceedings were used. It is often urged that grants are good till repealed by sei.fa., like a judgment unreversed, though erroneous, and that they cannot be treated as void in collateral actions. Now, the fact which makes void the grant cannot be determined otherwise than by jury, if it be disputed. The verdict must be founded upon facts proved by any sort of testimony by which such a fact can be proved in other cases, between A and B in case of a deed. If the grant were for concealed land, as stated in one of the cases cited, and the truth is that the lands were not concealed, for which untruth the grant is void in law, could you not prove to the jury that an account was rendered of them to the public officer ? 10 Rep. 109. If the grant were founded upon the warrant of commissioners, and the lands in fact were not within their commission, for which cause the grant is void, could you not show by parol testimony before a jury that the lands are situated at a place beyond the bounds stated in the commission ? 5 C. D. “ Patent,” F1. If the grant be of a bond in consideration, that is, to be forfeited hereafter, when it is already forfeited, and for such misstatement the grant be void, cannot this be shown by parol testimony ? 17 Viner, 103, pl. * 16. If confiscated lands be entered, surveyed, and granted, cannot the fact be shown both on a sci. fa. and in collateral actions, by parol proof showing that they were a part of the lands declared to be confiscated by law ? *680 And upon such parol proof will not a verdict find the fact ? Why not use here the same testimony as in the case of deeds, to overturn them, by showing such fraudulent acts as will invalidate them in law ? Will not a man’s inheritance be subverted in the one case as well as in the other ? It is enough that a jury is to pass upon the fact, and that it cannot be considered as established till their verdict pronounce it so. This is the provision which the Constitution has made for the safety of the citizens; and it is enough, so long as the trial by jury shall be preserved in its pristine purity. It is admitted that such evidence may be given on a sci. fa. or bill in equity ; why not also in ejectment when by law such fact is material to be ascertained in it ? Much injury it is said will result to purchasers if such be the law. Then let the Legislature confirm such grants, if they think proper, which are in danger. Their not doing it hitherto is a proof that they do not wish to interfere. The act of limitations, also, will settle a great number of such controversies. But what is a better answer and more proper for a republican court is, fiat justitia, mat ooelum. The rule of nullum tempus oc-curret, applies not in favor of a grantee under the State. The act runs against him from the date of his grant. In case the worst should happen, the innocent vendee may go upon his warranty, against his vendor, and so down to him that did the wrong. The law cannot be altered without legislative interposition for the accommodation of unrighteous grants, originating in fraud and imposition upon the public. Those which do not so originate are in no dread, nor in any danger from the deprecated doctrines. A enters and produces a grant for confiscated land or escheated * land, then another grant issues from the proper offices, observing all the forms and regulations of the law, and then the second grantee is sued by the first grantee. Must it not be inquired whether these were confiscated or escheated lands ? Must it not be allowed to be proved by parol, that the late owner is dead without kindred capable of inheriting his real estate? Must it not be allowed, with respect to the confiscated lands, to prove by parol that the same belonged to a refugee, and were a part of the lands which the law condemned for public uses ? If not, then he who is both fraudulent and illegal will prevail against him who is fair and legal in all respects. The idea advanced is a very correct and proper one, when grown to maturity, but very unsound in its *681 imperfect state. Lands granted cannot be resumed by the government upon statements and proofs made to and determined by the judges, or any other ■ persons, for fear of the mischiefs that oppression might bring on individuals, especially the weaker sort. They are surrounded by the protection of a jury. Their verdict is to be the foundation of proceedings on the part of the government; and until their verdict be of record, the fact does not appear which avoids the grant.' In this sense it is that a grant cannot be avoided by parol testimony. It cannot be rescinded but upon a verdict solemnly rendered and entered of record with the approbation of the judges. This is the highest act of solemnity known to our law, and gives a sure pledge to the citizen that his property will not be sacrificed at the whim and caprice of any power known in our Constitution. “No freeman shall be taken or imprisoned or disseised of his freehold, liberties, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land.” (Bill of Bights, § 8) ; in other words, by due course of law. Judgment to dis-seise him of his freehold cannot be rendered * but upon an office to serve as a foundation to a sci. fa. and verdict upon a traverse in favor of the State. That, and not parol testimony, .shall alone be competent in case of a disputed fact to support a judgment of repeal. The first step cannot be taken till after an office, either for causes of repeal antecedent to the patent or ex post facto. Hence has arisen the misunderstood expression that grants could not be made void on parol evidence. It is going much too far to say they cannot be avoided upon the foundation of a verdict, which itself is founded upon parol testimony of a fact, which can in other cases be proved by the same testimony. It is said the matter to impeach a grant can be more precisely stated in a bill in equity than it can be at law; but if a sci. fa. be used, surely as complete, pointed, and material an issue can be made up, upon the mutual pleadings and allegations of the parties, as by any bill in equity. If the remark'be meant of a collateral action, then the impeached grantee ought not to complain that the fact can be less forcibly urged in this way than upon a sci. fa. or bill in equity, and especially when in this way, though the effect of his grant shall be defeated in one action, new actions and new ejectments may be brought, till a full trial be had, and after all the grant is not rescinded.
*682 Can the impeached grantee complain of these liberalities ? And shall it be said of the impeaching cause, that it shall not now be urged in defense of present rights, for fear it may not be argued effect-, ually ? Shall I be excluded from defending myself now, in the expectation that after I have lost my property in the present action •that defense can be made and with more effect ? What shall become of me in the mean time ? I have heard it said by way of consolation that he who runs away may fight at another .day; but I have never heard it recommended to run away now and give up possession in hope of regaining it hereafter. * Why not repel the claim of your adversary now if it can be done ? It seems, therefore, very probable, that in this action the impeached grant, as to its effects, may be avoided, though it cannot be repealed upon evidence given in this action. If void, the judgment in this action may be given against those who claim under it, as if it were not at all in existence. And here it is not immaterial to remark, that in every American case where the validity of a grant has been examined, the question, it is believed, arose in a collateral action. The courts did not say they could not examine it. Look at these cases: they arose upon informations of intrusions, actions on the case, or actions of ejectment or other actions. Would the courts discuss the question if they could not determine it, or examine into the nullifying causes alleged, if, after ascertaining their existence, they could not advert to them in deciding the matter of dispute in that action ? I do not believe a single case has been. cited where the question arose on a sci. fa. or bill in equity for the same purpose. It arose in 4th Dallas, 237, in a feigned issue. on a wager, and in 245 the judgment is rendered without taking any notice of the grant. And so it arose in all the cases cited at the bar in former arguments,- as having been decided in this State. Not one in a suit the direct object of which was the repeal of the grant. In the labored case of a quo warranto information, and upon issues, made up in that action, the validity of the grants brought forward in pleading wfere discussed, and judgment was given -without taking notice in the judgment of the grant for the defendant. 2 Term, 515-569. Did any one of the learned counsel or judges doubt in this case, the propriety of the investigation ? or in 4 Term, 122 ? Why'say 'it shall be collaterally investigated, in case of being void for one cause, but not for being void for any other ? Are grants *683 void in any case but for an odious cause? And * shall they, notwithstanding that cause can be proven most satisfactorily, be held up as good grants, and be used to turn men out of their honest possessions, because such grants may not have been formally impressed with the seal of condemnation ? 1 Tenn. Rep. 314, 531, are upon collateral actions. But 1 Tenn. Reports, 31, it must be confessed, was upon a bill in equity to declare the patent void; and upon the default of- the defendant it was declared so. May it not be permitted to submit for reflection, that this bill was not founded upon any office returned of record ; which, had it been required, as in a sci. fa. it would, that decree possibly would never have passed. The case in 1 Tenn. Reports, 370, respects a grant becoming void ex post facto for non-registration, which is there'said to be only voidable, and was competent to be given in evidence; with which this present opinion precisely accords, and it was an incidental question. It is then very material to know for what causes a grant may be deemed void. If it be for matter not grantable by law it is void : as, for a monopoly in lands separated for special purposes from other public lands. 5 C. Dig. “Patent.” Also, if granted upon the supposed existence of a material fact suggested by the grantee, which fact does not exist, being a fact also without which the grant ought not to have issued, and could not have issued. 10 Rep. 112; 12 Mo. 78; 17 Viner, 97, pl. 3, pl. 4, pl. 6, pl. 7, pl. 10; 17 Viner, 100. It is void, also, if that which is the cause of the grant be falsely recited in the grant. 17 Viner, 104. It is void, also, if not issued upon sufficient authority; as, by persons having a commission, but not extending to the thing granted. 17 Viner, 14, pl. 2; 6 C. Dy. “Patent,” F 1; 17 Viner, 78.
But the grant is not void if any mistake of miscalculation, or wrong step taken by the officers of the government, in stages precedent to the emanation of the grant, which is not induced by the fraud or misconduct * of the grantee. The public employs them and is responsible for their acts, and must look for retribution in such cases to them, and not to the innocent grantee. It is not void if more lands be within the bounds described than the grant calls for (17 Viner, 103, pl. 21); nor if money paid be the consideration, and it never was paid (17 Viner, 181, pl.); nor if any personal thing or service be the consideration, which never was rendered or paid. 17 Viner. 187 pl. Imperfect and in *684 formal entries; wrong surveys without demarcation or chain carriers ; surveys not made to the cardinal points, but in forms different from those prescribed by law ; plats and certificates not made out and certified exactly as the law directs : these, if prejudicial to the government, are no causes for rescinding the grant. The government ought to suffer for the acts of its officers whom it appoints and trusts. Considerations past, and affirmed in the patent to be so, need not be found, and are not material; but considerations future must be performed, and must be found to have been so. 5 Rep. 94; 17 Viner, 151. And here it is not improper to add, that every grant is to be construed ad plenitudinem, so as not to be defeated if by any fair consideration it can be made conformable to the rules of law. 2 Inst. 496, 497. The government issues the grant, and is far more powerful, and at times more oppressive than any individual can be. Against that the Constitution is erected, and against him who seeks movers quieta. The law in justice ought to make construction rather for than against him who only seeks protection.
If then a void grant may be rejected, who in this form of action we must necessarily inquire into the obliged causes of invalidity, urged against the grant and in which the defendant claims; for if the grant be void the defendant cannot be entitled by it alone to hold possession; and then the principal question here is, could a military claim be satisfied when the * grant issued, by lands beyond the military bounds ? The act of 1783, ch. 3, § 7, directs “ that the officers and soldiers aforesaid shall enter and survey within the following bounds,” &c. § 8, “ No person or persons but the officers and soldiers (except settlers in Cumberland) shall enter any lands within the said bounds,” &c. But by 1784, ch. 19> § 7, it is enacted, “'that in case it shall happen that there is not a sufficient quantity of tillable land within the boundaries laid off for the officers and soldiers of the Continental line of this State, the deficiency shall and is hereby directed to be made up on any unappropriated lands within the bounds of this State.”
A similar provision is made in 1789, ch. 3, § 2: “ Such officer or soldier who shall fall short of his allotment or proportion, after all the lands fit for cultivation within the same bounds are appropriated, be permitted to take his quota, or such part thereof, &c., in any other part of said territory, intended to be ceded, &c., not already appropriated.” And in § 8 of the same act there is this clause, “ that *685 the laws in force and in use in the State of North Carolina, at the time of passing this act, shall be and continue in full force within the territory hereby ceded, until the same shall be repealed or otherwise altered by the legislative authority of said territory.” , In 1799, ch. 7, § 6, North Carolina declared, that in case of such deficiency the officer or soldier is entitled to receive such deficiency of his quota, in any part of the territory ceded by said act. 1789, ch. 8. The act of 1774, ch. 19, § 6, is not repealed or altered by the act of 1789, but has continued in force to this day ; and the main point to be decided is, who under this clause is to determine that there are not lands enough, fit for cultivation, to make good the several allotments, &c. ? All prior removals were from one spot to another in the district. But here the removal is from one district to another, a proof that the Legislature more favored the military * than any other class of men. It must be decided by some one, under this clause, what lands are not fit for cultivation. And in this particular there is much difference between the earlier settlers and those who inhabit the country at this day. Lands were not then deemed tillable unless of the first quality ; especially when speaking of lands to be laid off for an officer or soldier. At this day, almost all the lands in the country are deemed fit for cultivation. Who then would have said that the Stuart and Montgomery barrens were fit for cultivation ? Yet now they are deemed the best lands in the country. Where and by whom was this decision to be made under the act of 1784 ? This act could not be directory to a future Legislature, for that could as well make the provision, if necessary, as the Assembly of 17 89, and could ascertain whether the case contemplated did exist or not. The clause was very probably intended to operate upon those on whom the Assembly could legislate. Martin Armstrong, under the act of 1783, ch. 3, § 2, could receive entries only for lands within the military bounds; and he could do no more under the act of 1784, ch. 15. If, after the act of 1784, ch. 19, § 7, he still could not receive an entry nor sanction a survey, made out of the military bounds, then the clause in question was of no effect. It bound no one, commanded no one, nor was directory to any one, who was under any obligation to obey it. Now the construction is a bad one which makes void and of no effect the construed text. The clause must then mean that the deficiency should be determined when the entry was offered or survey made, *686 and that then the surveyor-general should decide whether there were tillable lands enough in the military bounds. His reception of the entry, or sanction of the survey, was in law a declaration of his opinion and sentence upon the subject. Who could better decide upon the fact ? He was a high officer, confided in by the Legislature, in these most important concerns. * He had given bond and taken an oath faithfully to perform the duties of his office. Pie lived upon the spot, and had better means of information than the Assembly of 1784, or any future Legislature could have. And where is the great harm if he should mistake a little ? A deserving officer or soldier would be gratified, and leave as much land within the military bounds for the public. If fit for cultivation, as it is insisted to have been, the public can readily dispose of it to another, at a future day. If not fit for cultivation, it ought not to be put upon the officer or soldier to take it. ■ This at least is a reason why, probably, the Legislature did not think the question of moment enough to be reserved for the ascertainment of a future Assembly. The law of 1783, ch. 3, § 8, in favor of the military, required their entries to be made in three years. It passed on the 10th of April, 1783, and was to expire in April, 1786. The law of 1784, ch. 19, § 7, passed the 22d October, 1784. The Assembly met on the 19th of November of that year. Could it be contemplated by the act of Assembly, 1784, that the Assembly in 1785 could ascertain the deficiency of tillable lands time enough to be carried into effect before the 10th- of April, 1786? Any law for that purpose could not be made and published and transmitted to Nashville, and made known to the people by that time. The Assembly of 1785, ch. 10, § 1, enlarged the time for eighteen months from the passing of that act as I understand it. Could the Legislature of 1784 calculate that such enlargement could ever take place ? It can from these considerations be almost pronounced with certainty that the Assembly of 1784 did not mean that the deficiency of tillable lands within the military bounds should be ascertained by the Assembly of 1785. Did they intend to leave that question to be decided at some future day, either upon a scire facias or issue upon a collateral action between the grantee and some other person ? They * could not so intend; for then the military grantee would be forever in danger and uncertainty by means of the pretended favor bestowed upon him, and finally might be ousted by *687 opinions changing with the times. These would say, why did you not go to the barrens ? They are tillable lands of the best quality ; and so of other lands not then deemed fit for cultivation. Could it be intended that the military could depend upon so much uncertainty, or indeed any uncertainty at all ? The Legislature could not mean it. And then they must have meant. that the surveyor-general, when he received an entry on vacant land, or. survey on a military warrant, for lands out of the military bounds, should have been previously satisfied that the claimant could not find military lands there deemed fit for cultivation. That such was the meaning of the Legislature, seems to be made evident by considering the act of the 1789, ch. 8. There is the provision that is in favor of the military, the same that is before adverted to ; and then a subsequent provision in favor of entries in John Armstrong’s office, located on lands already appropriated. The latter clause says, the locator shall have leave and be at full liberty to remove, &c. That is not materially different from the expression used in the preceding provision: such •officer shall be permitted to take his quota, &c., elsewhere. Shall have leave, and be at liberty to remove, and shall be permitted to take his quota, are to be understood of leave, liberty, and permission given by that law to those concerned or interested in ; not of leave, liberty, or permission to be given by some other and future law. Did not the Assembly deem it more safe for one citizen to be provided for instanter by force of a law made now, for the purpose, than by one to be made hereafter by those who might never choose to make it ? The duties which North Carolina owed to land claimants, who had fairly acquired their rights, decide unequivocally that * the Assembly ought not to devolve to their assignees or to future Legislatures; the performance could not be delegated for one instant without injustice to the claimants. Contemporaneous expositions as to entries made in John Armstrong’s office, on lands already appropriated, have irreversibly decided what in their case was meant by the law of 1789 saying, shall have leave, and be at liberty. Removals under and according to that clause have been made under and according to it ever since, which could not have been if the provision were to be made by Congress. If this clause itself gives immediately the leave and liberty to remove, why not do so the preceding clause, the permission to the officer or soldier, without any intermediation? There is no difference in *688 reason, and there ought not to be any in construction. The idea expressed in the North Carolina act of 1789, ch. 7, § 5, shows the opinion of that Assembly to be in conformity with that now entertained by some of the members of this court. Legislative exposition of statutes is of no weight in point of authority; but in point of respectability is oftentimes very considerable. They say in that act, after reciting the clause of 1789 we are now considering, that such officer or soldier is entitled, &c., in any part of the territory ceded. It explains the act of 1784 in favor of the claimants, and considers their right to be satisfied elsewhere, derived under that act, and not under any law to be made by Congress. The grant in question, therefore, cannot be void upon the idea of removal beyond the military bounds without authority. It was authorized in case of deficiency to be determined by the surveyor-general, and that is evidently his reception of the entry, or countersigning the plot and certificate of survey.
It is said that this opinion conflicts with Lyda and Prichet, decided by Judge Whvte, at Carthage. On the contrary, it accords with the principle of that * case precisely, and differs only in this, that in one opinion the grant of lands or military warrants beyond the military bounds was not authorized by the act of 1784, ch. 19, § 7, whereas, in this present opinion the authority is considered to have commenced by that act. It agrees, also, in principle, with the case of Goodloe and Wilson, and Polk and Sevier. The cases in 1 Haywood, 107, 130, 159, 375, and the decisions upon the same point in 2 Playwood, all taken together, establish the position that a grant cannot be repealed upon evidence given in a collateral cause, though upon such actions the effect of it may be avoided upon evidence which in law shows it to be void. And that is the point conceded in this present opinion. The case in 3 Call, 419, shows that the mistakes and miscalculations of public officers shall not vitiate a grant, and that is acceded to most completely in the present opinion. 2 Washington, 116, determines that a grant obtained to the prejudice of a prior equity shall be conveyed to the prior equity. That, also, is now acceded to most fully; for the grant, being good in law, cannot be repealed as a void grant may; and the grantee must be converted into a trustee, or justice cannot be effected. The New Y. T. 426, shows that information of an intrusion would not lie for a grant alleged to have become *689 void for non-registration, the State having never acquired seisin bj office, and sci.fa. the entry made the State has, of acquiring possession in such case. The present case exactly accords, and so does the case of Weakly and Simmons, in Tennessee Reports, which the present case unreservedly accords with. It is useless to be more particular. All the other American cases which have been cited fall under some one or other of the heads of this present opinion, and are approved by the principles now adopted. 3 Binney, 28, 35; 3 Mass. 379; 1 Johnson, 495; 1 Tenn. Reports, 318, 319, 269; 2 Tenn. Rep. 303; 1 T. Rep. * 531, 533, 315; 2 T. Rep. 35, 154, 155; Hard. 508; Cooke’s Reports, 196; 1 T. Rep. 161; 1 Haywood, 389; 2 T. Reports, 335; 1 T. Reports, 323; 2 Haywood, 98; 1 T. Reports, 315, 17, 30; 2 T. Rep. 35, 36, 37, 38; 1 T. Rep. 187; 1 Haywood, 498; 2 Haywood, 98.
The argument founded on the omission of the Legislature to provide for certificates, in case of military warrants carried into grants, for lands beyond the military bounds, can only show their opinion, but in point of authority is nothing. Judicial opinions can only be given by the judiciary; and, in forming them, the rules of the law and of the Constitution are principally to be consulted. The Legislature might have overlooked it. It may be a cams omissus, or they have judged correctly upon it. But it is our duty to ascend to the source and spirit of the law, and not rest the rights of the citizen upon any opinions whatever entertained by those not constitutionally intrusted to form them. This argument, then, weighs nothing either way.
And nearly the same may be said of the act of 1815, so far as it may tend to annihilate private rights already acquired, or to impair them in any degree by legislative interference. It commands not in any degree, I presume, the obedience of this court. All such acts had better not be made ; for judges cannot, either in preserving their oaths or patriotism, give to them the least coloring of submission. That judge is not worthy to have the confidence of his country, who would not unhesitatingly oppose them with all the energies he possesses. What is the displeasure of those who make such an act, compared with the maintenance of public freedom ? And how is this to be supported, but by a prompt and decided opposition to all unconstitutional assumptions of power ? What must be the opinion entertained of a judge, should an unconstitu *690 tional law ever be made, with an expectation that he will give it effect ?
* Much respect is felt for Lyda and Prickett, both because of the judge who decided it, and also because the reasoning employed in the case itself is entitled to much consideration. But, as to that part of it not accorded with, the decision of a single judge ought not to govern in point of authority, if, after much endeavor to agree with it, a full court cannot reconcile it to their convictions. And as to the part of that case in which the difference of opinion is found, I cannot, after much pains taken for the purpose, be satisfied with the part which the present opinion is opposed to. Affirm the judgment of the Circuit Court.
See, as to attaching grants in collateral actions, Conn v. Haislip, 1 Swan, 31; Crutchfield v. Hammock, 4 Hum. 203. See King’s Digest, 3501, 7837, 7929, 7432.